## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-01877

KENDRICK BUFORD,

     Plaintiff,

v.

CALFRAC WELL SERVICES, CORP.

     Defendant

---

## COMPLAINT AND JURY DEMAND

---

**COMES NOW**, Plaintiff, Kendrick Buford, by and through his counsel, BAUMGARTNER LAW, L.L.C., respectfully submits this Complaint and Jury Demand against Defendant, Calfrac Well Services, Corp., and alleges and avers as follows:

### JURISDICTION AND VENUE

1.    Plaintiff brings this action pursuant to the Americans with Disabilities Act, 42 U.S.C. §12101 *et. seq.* ("ADA"), and Title VII of the Civil Rights Act, 42 U.S.C. §2000e *et seq.* ("Title VII"), and C.R.S. § 34-24-401 *et. seq.*

2.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1343(a)(4), 1367, 42 U.S.C. 2000e-5, and the aforementioned statutory provisions.

3.    This Court has personal jurisdiction over Defendant because Defendant's principal place of business is located in Colorado, and because Defendant has transacted business in Colorado that has given rise to this cause of action.

4.    Venue is proper in the United States District Court for the District of Colorado under 42 U.S.C. § 2000e-5(f)(3), because the relevant employment records are

kept in Colorado, decisions adverse to Plaintiff's employment that are the subject of this action were made in Colorado, because Plaintiff worked in Colorado at the time of Defendant's unlawful employment practices, and because Plaintiff would have worked in Colorado if not for Defendant's unlawful employment practices.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

5.      Plaintiff has timely invoked and fully exhausted all administrative remedies applicable to this action. Plaintiff received an Equal Employment Opportunity Commission "Right-to-Sue Letter" on April 26, 2016, and timely filed his Complaint on July 21, 2016.

## PARTIES

6.      Plaintiff, Kendrick Buford, is an African-American male who suffers from diabetes, a "disability" as defined by the ADA . He is a citizen of the United States and currently resides in the State of Colorado. At the time of the incidents that gave rise to this action, Plaintiff was a resident of the State of Colorado, residing at 6820 Highway 79, Bennett, CO 80102.

7.      Defendant, Calfrac Well Services, Corp.  is an oil and gas exploration company operating out of Colorado and other states that primarily engages in fracking enterprises. Calfrac's principal office address is 717 17th Street, Denver, Colorado, 80202. At all times relevant to this action, Defendant has been an employer as defined by the ADA and Title VII.

## GENERAL ALLEGATIONS

8.      Plaintiff incorporates by reference herein the allegations contained in paragraphs 1 through 7 of this Complaint and Jury Demand.

9.      Plaintiff was hired by Defendant, Calfrac Well Services Corp., in October of 2011 in Grand Junction, Colorado, and worked for Defendant until he was unlawfully terminated on June 30, 2014.

2

10. During Plaintiff's employment, he was an exemplary employee and received several performance reviews well above average.

11. Plaintiff never received any disciplinary actions or negative performance reviews before February 2014.

12. During Plaintiff's employment with Defendant, he and other African-American employees were repeatedly subjected to racist comments, jokes and slurs, and coworkers and supervisors alike frequently used the word "nigger" in their presence.

13. These comments were made by employees and supervisors alike, including but not limited to, Jeremy Durham, Dave Scoggins, Eddie Facado, and Nathan Davis.

14. Several of the white employees had the letters "WP" drawn onto their hard hats. Everyone on the work site, including the supervisors, were aware that "WP" stands for "White Power," the term popularized by the founder of the American Nazi Party, and universally associated with the neo-Nazi movement.

15. Plaintiff and other African-American employees complained about the use of this language and the display of the intimidating and threatening initials "WP" to supervisors, but no preventative or corrective action was taken.

16. During Plaintiff's employment, there were no African-American supervisors, although multiple African-American employees were better qualified than the white employees who received promotions from the same or lower positions.

17. One African-American employee, Marcus Rashaad, was scheduled to be promoted to a supervisor position. However, shortly before Mr. Rashaad's promotion, he was harassed by white employees and supervisors for wearing a hoody sweatshirt, which was not against company policy. Mr. Rashaad was fired shortly thereafter.

18.     Often, the better-qualified African-American employees trained white employees who subsequently received promotions and became supervisors to the same African-American employees who had trained them.

19.     During Plaintiff's employment, he was repeatedly passed over for promotions in favor of white employees, some of whom Plaintiff trained, and who were less qualified than Plaintiff.

20.     In 2013, Plaintiff brought this to the attention of his supervisor, and asked to be promoted. He was told that he had to pass a proficiency test to qualify for the promotion.

21.     White employees who obtained the same promotion were not required to take a proficiency test.

22.     Plaintiff scored a 98% on the proficiency test, but was still not promoted until he again complained. In fact, none of his supervisors were aware of his score until he again complained and brought the results of the test to their attention.

23.     In September of 2013, Calfrac changed its working schedule for field employees, which caused a large percentage of the employees to quit, including many of supervisors.

24.     No African-American employees were promoted to fill the newly vacant supervisor positions. Only white employees were promoted, despite being less qualified than the African-American employees who were not promoted.  Some of the white employees who were promoted displayed the "WP" or "White Power" initials on their hard hats,

25.     In February of 2014, Plaintiff received his first disciplinary action for engaging in "horseplay" with a white coworker. Plaintiff received a write-up, was forced to clock out, and lost his safety bonus. The white employee only lost his safety bonus.

26.     On February 26, 2014, Plaintiff saw his doctor because he suspected that he had

type-two diabetes.

27.     During that appointment, Plaintiff's doctor detected dangerously high blood sugar levels and a highly irregular heartbeat. Fearing that Plaintiff was in imminent danger of having a heart attack, Plaintiff's doctor immediately sent him to St. Mary's Hospital in Grand Junction, Colorado.

28.     Plaintiff stayed at St. Mary's Hospital for three days, where he received treatment to reduce the risk of heart attack, and was diagnosed with diabetes.

29.     On March 4, 2014, Plaintiff obtained clearance from his doctor to return to work.

30.     That same day, Plaintiff emailed his supervisor, Nathan Davis, the clearance letter from his doctor, and informed Mr. Davis that that he was ready to return to work.

31.     Plaintiff's supervisors attempted to discourage and prevent him from returning to work by requiring that he obtain a Department of Transportation ("DOT") physical exam, which is required for employees whose jobs require a commercial driver's license ("CDL").

32.     However, Plaintiff's job position did not require a CDL, and therefore did not require a DOT physical. Plaintiff pointed this out to his supervisor, Mr. Davis, who ignored this fact and insisted that Plaintiff obtain a DOT before returning to work.

33.     Plaintiff had already passed a DOT physical with his private doctor, but Defendant insisted that he make another appointment through its doctor of choice.

34.     Other employees in Plaintiff's job position were not required to obtain a DOT physical, or to have a CDL.

35.     In order to get back to work, Plaintiff agreed to submit to another DOT examination.

36.     Despite the fact that Plaintiff agreed to undergo an unnecessary DOT

examination, for approximately four weeks Defendant delayed Plaintiff's return to work in the following ways:

      a.      twice sending him to the wrong corporate official,

      b.      refusing to schedule an appointment for the DOT physical,

      c.      sending him necessary documents (twelve in all) one at a time, and

      d.      by consistently ignoring his many attempted communications with supervisors and other corporate officials regarding the delay.

37.      Despite the fact that Plaintiff was cleared by his doctor to return to work on March 4, 2014, Defendant enrolled him in short-term disability on March 6, 2016.

38.      Eventually, Plaintiff took and passed the DOT physical exam and returned to work.

39.      Once Plaintiff returned to work, he was immediately treated differently than other employees, and Defendant continued to exert pressure on Plaintiff to quit his job.

40.      Defendant's supervisors repeatedly discussed interviews with potential replacements for Plaintiff while in Plaintiff's presence.

41.      Plaintiff was also repeatedly reprimanded for conduct that white and non-disabled employees engaged in without consequence.

42.      On or around June 14, 2014, Plaintiff was in the field with Nathan Davis, a supervisor, and Jeremy Durham, a coworker. Mr. Durham forgot to bring his required hard hat, so he took Plaintiff's. Because Plaintiff then did not have a hard hat, Mr. Davis told him to remain in the truck.

43.      After Plaintiff waited in the truck for over an hour, Mr. Davis returned and accused Plaintiff of sleeping and of being in the truck without authorization.

44.     At the same time that Mr. Davis reprimanded Plaintiff for being in his truck, a white coworker, "Aaron" had been sleeping in the truck adjacent to Plaintiff's for over an hour.

44.     Mr. Davis was aware of the white coworker sleeping in the adjacent truck. Sleeping on an active fracking site was a violation of company policy. The white coworker was never reprimanded or disciplined.

45.     On June 24, 2016, Plaintiff was told by a white supervisor, Mitch Byman that other employees were attempting to reach Plaintiff on his radio. Plaintiff explained that he had not heard any requests over the radio, and that sometimes radio signals do not come through in the field.

46.     Later that shift, that same supervisor, Mr. Byman, was similarly unreachable by radio, and another employee had to run and find Mr. Byman in the field.

47.     On June 26, 2014, Steve Calvin, one of Plaintiff's supervisors, told plaintiff that he would no longer be going out in the field, and that he would be relegated to the "yard," installing GPS systems on company vehicles. This job assignment was universally considered less desirable than working in the field.

48.     On June 30, 2014 Plaintiff's immediate supervisor, Steve Calvin, ordered him to call Thomas Moseley in Human Resources. Mr. Calvin advised Plaintiff that Mr. Moseley wanted to speak to Plaintiff about not answering his radio while he was in the field on June 24, 2014.

49.     During his conversation with Mr. Moseley, Plaintiff explained that radio signals did not always come across in the field, and that missed calls were quite common. However, Mr. Plaintiff also explained that his supervisor, Mr. Byman, could not be reached over the radio on the same shift.

50.     Mitch Bynum, a white employee, was not reprimanded or disciplined for not responding to his radio. Similarly, other white employees who did not answer radio calls were not reprimanded or disciplined.

51.     Mr. Moseley responded to Plaintiff's explanation about the radio by saying that Plaintiff had been warned about being in his truck when he was not supposed to be, apparently referencing the June 14th incident. See paragraph s 41 through 44.

52.     Later that day, June 30, 2014, Plaintiff was called into the Maintenance Department Manager's office and told that he was terminated. The Maintenance Department Manager, Casey Arnold, refused to give Plaintiff a reason for his termination, and told him only that the decision was made by Thomas Moseley.

53.     Plaintiff filed for unemployment benefits, and Defendant contested his right to unemployment benefits.

54.     The unemployment agency determined that Plaintiff was not fired for cause.

**CLAIMS FOR RELIEF**

I.     **Employment Discrimination on the Basis of Race in Violation of Title VII of the Civil Rights Act**

55.     Plaintiff incorporates by reference herein the allegations contained in paragraphs 1 through 53 of this Complaint and Jury Demand.

56.     Plaintiff, Kendrick Buford, was subject to disparate treatment because of his protected status as an African-American .

57.     Plaintiff's race and color was either the sole reason or a motivating factor for Defendant's decision to not promote Plaintiff, for Defendant's decision to place Plaintiff in an undesirable job assignment, and for Defendant's decision to discharge Plaintiff.

58.     Defendant stated reasons for discharging Plaintiff were not the true reasons, but

instead were pretext to hide Defendant's discriminatory motivations.

59.     Plaintiff was subjected to harassment, including offensive racial comments, neo-Nazi symbolism,  racist jokes, and slurs because of his protected status as an African-American.

60.     This conduct was sufficiently pervasive and severe to alter the conditions of Plaintiff's employment, and created an abusive working environment.

61.     Both supervisors and coworkers contributed to the harassment.

62.     Defendant knew or should have known about the harassment, because Plaintiff and other African-Americans reported it, because supervisors participated in it, and because the neo-Nazi symbolism was in plain sight, but Defendant failed to take any corrective or preventative action.

63.     As a direct and proximate result of Defendant's actions Plaintiff has suffered damages including emotional and psychological distress, loss of wages, loss of future earnings, loss of future wages, loss of benefits, loss of future benefits, loss of earning potential, and loss of career advancement.

64.     The unlawful employment practices complained of above were committed intentionally.

65.     The unlawful employment practices complained of above were committed with malice, or at least with reckless indifference to Plaintiff's federally protected rights, thereby subjecting Defendant to punitive damages.

66.     Plaintiff is also entitled to recover his reasonable costs and attorney's fees for bringing this action, pursuant to 42 U.S.C. §2000e-5(k).

## II.     Employment Discrimination on the Basis of Disability in Violation of the Americans With Disabilities Act.

67. Plaintiff incorporates by reference herein the allegations contained in paragraphs 1 through 65 of this Complaint and Jury Demand.

68. Plaintiff suffers from diabetes, a disability as defined by the ADA.

69. Plaintiff was at all times able to perform the essential functions of the employment position that he held. Plaintiff satisfied the requisite skill, experience, education, and other job-related requirements of his employment position, as shown by his nearly three-year employment with Defendant and his multiple outstanding performance reviews.

70. Plaintiff suffered adverse employment actions by Defendant including being prevented from returning to work, being given undesirable job assignments, and being discharged.

71. Plaintiff's disability was the sole reason or a motivating factor for Defendant's decision to take the aforementioned adverse employment actions.

72. Defendant stated reasons for discharging Plaintiff were not the true reasons, but instead were pretext to hide Defendant's discriminatory motivations.

73. As a direct and proximate result of Defendant's actions Plaintiff has suffered damages including emotional and psychological distress, loss of wages, loss of future earnings, loss of future wages, loss of benefits, loss of future benefits, loss of earning potential, and loss of career advancement.

74. The unlawful employment practices complained of above were committed intentionally.

75. The unlawful employment practices complained of above were committed with malice, or at least with reckless indifference to Plaintiff's federally protected rights, thereby subjecting Defendant to punitive damages.

76.     Plaintiff is also entitled to recover his reasonable costs and attorney's fees for bringing this action, pursuant to 42 U.S.C. §12205.

### III.     Employment Discrimination on the Basis of Race in Violation of C.R.S. 24-34-306, and 24-34-402

77.     Plaintiff incorporates by reference herein the allegations contained in paragraphs 1 through 74 of this Complaint and Jury Demand.

78.     Plaintiff, Kendrick Buford, was subject to disparate treatment due to his protected status as an African-American

79.     Plaintiff' race and color was either the sole reason or a motivating factor for Defendant's decision to not promote Plaintiff, for Defendant's decision to place Plaintiff in an undesirable job assignment, and for Defendant's decision to discharge Plaintiff.

80.     Defendant stated reasons for discharging Plaintiff were not the true reasons, but instead were pretext to hide Defendant's discriminatory motivations.

81.     Plaintiff was subjected to harassment, including offensive comments, racist jokes, and slurs because of his protected status as an African-American.

82.     This conduct was sufficiently pervasive and severe to alter the conditions of Plaintiff's employment, and created an abusive working environment.

83.     Both supervisors and coworkers contributed to the harassment.

84.     Defendant knew or should have known about the harassment, because Plaintiff and other African-Americans reported it, and because supervisors participated in it, but Defendant failed to take any corrective or preventative action.

85.     As a direct and proximate result of Defendant's actions Plaintiff has suffered damages including emotional and psychological distress, loss of wages, loss of future earnings,

loss of future wages, loss of benefits, loss of future benefits, loss of earning potential, and loss of career advancement.

86.     The unlawful employment practices complained of above were committed intentionally.

87.     The unlawful employment practices complained of above were committed with malice, or at least with reckless indifference to Plaintiff's federally protected rights, thereby subjecting Defendant to punitive damages.

88.     Plaintiff is also entitled to recover his reasonable costs and attorney's fees for bringing this action, pursuant to C.R.S. 24-34-405(5).

## VII.    Employment Discrimination on the Basis of Disability in Violation of C.R.S. § 24-34-306, and § 24-34-402

89.     Plaintiff incorporates by reference herein the allegations contained in paragraphs 1 through 86 of this Complaint and Jury Demand.

90.     Plaintiff suffers from diabetes, a disability as defined under C.R.S. § 24-34-301, and the ADA.

91.     Plaintiff was at all times a qualified individual, able to perform the essential functions of the employment position that he held. Plaintiff satisfied the requisite skill, experience, education, and other job-related requirements of his employment position, as shown by his nearly three-year employment with Defendant and his multiple outstanding performance reviews.

92.     Plaintiff suffered adverse employment actions by Defendant including being prevented from returning to work, being given undesirable job assignments, and being discharged.

93.     Plaintiff's disability was the sole reason or a motivating factor for Defendant's decision to take the aforementioned adverse employment actions.

94.     Defendant stated reasons for discharging Plaintiff were not the true reasons, but instead were pretext to hide Defendant's discriminatory motivations.

95.     As a direct and proximate result of Defendant's actions Plaintiff has suffered damages including emotional and psychological distress, loss of wages, loss of future earnings, loss of future wages, loss of benefits, loss of future benefits, loss of earning potential, and loss of career advancement.

96.     The unlawful employment practices complained of above were committed intentionally.

97.     The unlawful employment practices complained of above were committed with malice, or at least with reckless indifference to Plaintiff's federally protected rights, thereby subjecting Defendant to punitive damages.

98.     Plaintiff is also entitled to recover his reasonable costs and attorney's fees for bringing this action, pursuant to C.R.S. 24-34-405(5).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Kendrick Buford, prays for relief as follows:

1.     Nonpecuniary damages, including, but not limited to mental anguish, emotional distress, loss of enjoyment of life, and deprivation of civil rights;

2.     Pecuniary damages, including but not limited to, loss of earnings and/or earning capacity, out of pocket expenses in an attempt to mitigate his losses;

3.     Lost benefits in the form of medical expenses;

4.     Back pay in amounts to be determined at trial;

13

5.     Front pay;

6.     Statutory damages;

7.     Punitive damages as allowed;

8.     Injunctive and/or declaratory relief;

9.     Attorney's fees, costs and expenses of this action as provided for by law; and

10.     Any such further relief as justice allows.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated this 21st day of July, 2016.

Respectfully submitted,

BAUMGARTNER LAW, L.L.C.
*Original signature on file at Baumgartner Law, L.L.C.*
*s/ S. Birk Baumgartner*
S. Birk Baumgartner
209 Kalamath Street, Suite #23
Denver, Colorado  80223
Ph:    (720) 626-9418
Fax:   (720) 634-1018
birk@baumlawdenver.com

<u>Plaintiff's Address</u>:
6820 Highway 79
Bennett, Colorado 80102